

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00061-CV

**IN THE INTEREST OF D.S.O.**

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-PA-01423
Honorable Charles E. Montemayor, Associate Judge Presiding

Opinion by:      Karen Angelini, Justice

Sitting:         Karen Angelini, Justice
                 Sandee Bryan Marion, Justice
                 Luz Elena D. Chapa, Justice

Delivered and Filed:  June 18, 2014

AFFIRMED

Roxanne S. appeals the trial court's order terminating her parental rights to her daughter D.S.O. On appeal, Roxanne S. argues the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship was in her daughter's best interest. We affirm.

### BACKGROUND

Roxanne S.'s daughter, D.S.O., came into the care of the Texas Department of Family and Protective Services in June 2012 when she was found on the floorboard of a pick-up truck used as the get-away vehicle in a convenience store robbery. D.S.O. was eleven months old at the time. Methamphetamines were also found in the pick-up truck. At the time she was taken into the Department's custody, D.S.O. was suffering from an infection in her mouth and had hearing

problems. She was also mentally and physically delayed for her age. D.S.O. was placed with foster parents, who at the time of the termination hearing were seeking adoption. D.S.O. was two years old at the time of the termination hearing.

D.S.O.'s mother, Roxanne S., testified that D.S.O. was about seven or eight months old when Roxanne S. was arrested and jailed. Roxanne S. had been a passenger riding in a SUV that was pulled over for a traffic violation. Because Roxanne S. had an outstanding warrant for assaulting her girlfriend Melissa, she was arrested at the scene. Roxanne S. left D.S.O., who had also been a passenger of the SUV, in the care of her friend Esperanza. According to Roxanne S., while she was in jail, she attempted to get in touch with her mother and her sister so that they could care for D.S.O., but was unable to reach them.

When D.S.O. was found on the floorboard of the get-away car, she was in the care of Melissa. Roxanne S. testified that she did not know Melissa had been taking care of D.S.O. Roxanne S. had left D.S.O. in Esperanza's care, and then Esperanza had given D.S.O. to her "other friend Veronica." Roxanne S. testified, "I think [D.S.O.] was handed off like four times." "I think she went through like four people." "I found out that Melissa was staying with Veronica, and I didn't know because she was my friend, and I was like, 'Why is she staying there?' and she said, 'Oh, I let her stay here so she could take care of [D.S.O.].'"

Roxanne S. admitted that she had had multiple convictions for theft and assault bodily injury, which she attributed to having been a drug addict. In all, she had been convicted for seven thefts, five of which were felonies. She testified that she would steal to support her habit. At the time of the hearing, she was on deferred adjudication community supervision, and she had been working in the warehouse of Sterling Foods where she earned minimum wage. She also testified that she worked as a tattoo artist. She admitted that her Facebook page advertised for her tattoo services, which she performed in her home. Because she was unlicensed, she stated that she was

no longer performing tattoo services out of her home and was apprenticing with a licensed tattoo artist. She claimed that her Facebook page still advertised for services out of her home because she had forgotten her login password. Also on her Facebook page were photos of persons, including children, making gang hand symbols.

Roxanne S. admitted that she had a prior case involving the Department. Two of her other children had been taken out of her care because of her cocaine and heroin use. She testified that she stopped using illegal drugs when she found out she was pregnant with D.S.O., which was when she was six weeks along in her pregnancy. According to Roxanne S., she began using illegal drugs when she was eighteen and had used them on and off for the past seventeen years. She also admitted that her ex-husband had been a member of a gang. According to Roxanne S., five years ago, when she was with her ex-husband, she was affiliated with that gang and still had two gang tattoos. She testified that the tattoos were large, and she wanted to cover them but could not yet afford to do so.

Roxanne S. recognized D.S.O. has some hearing problems, which resulted in D.S.O. having an operation. Roxanne S. testified that D.S.O. had gotten her immunizations at the hospital when she was born but had not received any after that time. And, Roxanne S. admitted that D.S.O. had been overweight while in her care. Roxanne S. stated, "I started to cut down on her food a little bit, but like not too much because I didn't want her to like be screaming that she was hungry. Like I didn't want to do it like all fast, so I tried to cut down little by little." According to Roxanne S., D.S.O.'s mouth had become infected while D.S.O. was in Melissa's care. D.S.O. had fallen out of the bath tub, bruising her mouth and busting open her lip. D.S.O.'s mouth was then not properly treated, which resulted in it becoming infected.

During her testimony, Roxanne S. verified that Jessica, her former girlfriend, was sitting in the courtroom. Roxanne S. acknowledged Jessica accompanied her during her visitations with

D.S.O. Roxanne S. claimed she was not currently in a relationship with Jessica, but confirmed that Jessica had had two cases with the Department involving allegations of sexual abuse of a child. Roxanne S. stated that those allegations had been "ruled out." According to Roxanne S., "[w]hen she's with me, there wouldn't be anything wrong with" Jessica being around D.S.O. Roxanne S. stated, "There's a lot of people out there that I need to watch over my baby."

Sharon Watkins, a case worker assistant with the Department, testified that she monitored visits between Roxanne S. and D.S.O. Watkins testified that Roxanne S. had bonded with D.S.O. She noted that Roxanne S. brought her girlfriend Jessica to the visits. Watkins complained that although Roxanne S. was supposed to look after D.S.O.'s hygiene during visits, she would not change D.S.O.'s diapers.

Francine Steely, director of the Apple Tree Day School where D.S.O. attends, testified about the strong bond between the foster mom and D.S.O. Steely noted that when D.S.O. would return from visits with Roxanne S., she would be "much more aggressive, not happy for a time until she got readjusted back in the classroom."

Serika Cuellar, an Early Intervention Specialist with Easter Seals, testified that she worked with D.S.O. four times a month for a year. According to Cuellar, D.S.O. came into the program because she was developmentally delayed. Cuellar noted that the foster parents were receptive to her suggestions and recommendations for D.S.O. The foster parents made the recommended changes and were in constant communication with Cuellar. Cuellar testified that D.S.O. flourished in the care of the foster parents. She went from a developmentally-delayed child to one meeting all developmental goals. At the urging of the foster mom, Cuellar also met with Roxanne S. However, according to Cuellar, Roxanne S. was not receptive to Cuellar's recommendations regarding D.S.O.

Alicia Isabelle, who is employed with the Children's Shelter, is a foster care case manager. She testified that D.S.O. had bonded with her foster parents and was a happy child. According to Isabelle, the foster parents had gone above and beyond to meet D.S.O.'s therapeutic needs.

Jennifer Iruegas, a caseworker with the Department, testified that when D.S.O. came into the Department's care, "there were lesions and sores in and around her mouth." "There were bruises throughout her body." D.S.O. was given medication to treat the bacterial infection around her mouth. Iruegas was assigned to D.S.O.'s case in late September 2012. At that time, Roxanne S. was no longer in jail. Iruegas testified that she was concerned because although Roxanne S. had left D.S.O. in the care of a friend, she had no real understanding as to why D.S.O. had lesions on and around her mouth. Roxanne S. gave Iruegas "different stories" of how D.S.O. was injured. Roxanne S. did tell her that D.S.O.'s mouth had become infected because she did not receive proper medical attention. According to Iruegas, the Department took D.S.O. into its care not only because she was found in the get-away car of a robbery but also because she had physical injuries. Iruegas testified that when she asked Roxanne S. why D.S.O. had not been in the care of family members, Roxanne S. said she could not reach any family members.

Iruegas also testified that Roxanne S. had not shown stable employment, because she had frequently changed jobs. Iruegas also had not had an opportunity to see Roxanne S.'s home. Iruegas noted that D.S.O. required some therapeutic services and "from that experience, the Department feels that [Roxanne S.] is not willing, ready, or able to continue or even participate in those services that are required of her child." Iruegas testified about the meeting with Cuellar from ECI services: "[I]t was very visible that mom was getting frustrated and mid-meeting asked to speak with me after the visit. After the visit was completed, she informed me that [the visits were] her time and that she no longer wanted Ms. Cuellar to attend the visits." Iruegas emphasized to Roxanne S. "the importance of redirection and the behaviors that [D.S.O.] was having because of

the constant change of environment from unstructured to very structured upon returning to day care." However, according to Iruegas, Roxanne S. was adamant that she "did not wish to share her time with the therapist." Iruegas also observed that during the visits, Roxanne S. was not meeting the hygiene needs of D.S.O.

Iruegas explained that although Roxanne S. completed many services, there were still several areas that the Department believed posed a safety risk to D.S.O. According to Iruegas, she was concerned about Roxanne S.'s "neglectful supervision and the fact that – the reason the child came into care along with mom's absence and her being on parole and the probability and possibility of her ending up in the same situation." Iruegas was also concerned about "[t]he way the child came into care." She had been left in the care of someone who had committed a robbery with her in the get-away car. She "was overweight." She was developmentally delayed. She had speech and hearing issues. Iruegas was also concerned about the environment D.S.O. would return to and the people to whom she would be exposed. Iruegas listed other concerns: Roxanne S.'s "continued tattooing from the home, continuing to be advertised on Facebook; the repeated visits from the San Antonio Police Department to the home regarding Roxanne's granddaughter and her daughter; and the situation with Child Protective Services, several allegations of sexual abuse, and the very present ex-paramour and her history with CPS." According to Iruegas, Roxanne S. had "informed me of times where they had to call the police because of her granddaughter's father arriving at the home or looking for the granddaughter." Iruegas also pointed to allegations of sexual abuse against Jessica regarding Roxanne S.'s young granddaughter. Iruegas noted that Jessica had "been present at every hearing and mediation" and was present at the termination hearing. Iruegas further noted that Jessica had been invited by the mom to attend visits with D.S.O. Iruegas emphasized that there were three referrals against Jessica and Roxanne S. had been warned

"repeatedly" about the potential danger Jessica poses to D.S.O. She nevertheless continued to bring Jessica around D.S.O.

Iruegas also pointed to Roxanne S.'s Facebook page: "continued advertisement of tattoos in the home, very explicit pictures, drug paraphernalia, inappropriate language, gang signs, children throwing gang signs." Iruegas felt Roxanne S. was lacking the ability to pick appropriate people to have around her child. Iruegas pointed to Roxanne S.'s former girlfriend Melissa who had committed the robbery that led to the Department's removal of D.S.O. Iruegas testified that it was in D.S.O.'s best interest to remain with her foster parents. Iruegas emphasized D.S.O.'s "progression throughout the case, her developmental progression, the seriousness that [the foster parents] take her medical and physical needs, their continued engagement with therapists and [Iruegas]." Iruegas testified that the foster parents meet all of D.S.O.'s needs.

Leslie Vanaman, a licensed professional counselor, testified that Roxanne S. successfully completed ten sessions. And, there was testimony from the foster mother's sister that the foster parents would make appropriate and loving parents for D.S.O., and were able to provide a stable environment.

After hearing all the evidence, the trial court terminated Roxanne S.'s parental rights, finding that she had (1) knowingly placed or knowingly allowed D.S.O. to remain in conditions or surroundings that endangered her physical or emotional well-being, pursuant to section 161.001(1)(D) of the Texas Family Code; (2) engaged in conduct or knowingly placed D.S.O. with persons who engaged in conduct that endangered her physical or emotional well-being, pursuant to section 161.001(1)(E); and (3) constructively abandoned D.S.O, who had been in the permanent or temporary managing conservatorship of the Department or an authorized agency for not less than six months and (i) the Department or authorized agency had made reasonable efforts to return D.S.O. to Roxanne S., (ii) Roxanne S. had not regularly visited or maintained significant contact

with D.S.O., and (iii) Roxanne S. had demonstrated an inability to provide D.S.O. with a safe environment, pursuant to section 161.001(1)(N). The trial court also found that termination of the parent-child relationship between Roxanne S. and D.S.O. was in D.S.O.'s best interest. Roxanne S. appealed. On appeal, she challenges only the best-interest finding.

## TERMINATION OF PARENTAL RIGHTS

Parental rights may be terminated only upon proof of clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code, and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001 (West 2014). Here, Roxanne S. challenges the best-interest finding, arguing the evidence is legally and factually insufficient.

When the legal sufficiency of the evidence is challenged, we look at all the evidence in the light most favorable to the trial court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* (citation omitted). "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (citation omitted). "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *Id.* at 344-45 (citation omitted).

When a parent challenges the factual sufficiency of the evidence on appeal, we look at all the evidence, including disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record,

the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (citation omitted); *see also In re A.B.*, No. 13-0749, 2014 WL 1998440, at *3 (Tex. May 16, 2014). In reviewing termination findings for factual sufficiency, we give due deference to the factfinder's findings and do not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *see In re A.B.*, 2014 WL 1998440, at *3 (explaining that while there is a heightened standard of review in parental termination cases, a "court of appeals must nevertheless still provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

On appeal, Roxanne S. argues that the evidence is legally and factually insufficient to support a best-interest finding because the "child would benefit from having continued contact and visitation with her mother." According to Roxanne S., "[g]iven the facts, a better solution is to simply restrict [Roxanne S.]'s parental rights for the near future." Roxanne S. stresses that she completed her service plan and received the recommendation from a licensed professional counselor. Thus, she argues that the evidence is legally and factually insufficient to show termination of her parental rights is in D.S.O.'s best interest, and asks that we reverse the trial court's order, name her possessory conservator of the child, and remand this case back to the trial court for further orders regarding visitation and child support.

When the court considers factors related to the best interest of the child, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West 2014). And, in determining whether the child's parents are willing and able to provide the child with a safe environment, the court should consider the following:

- the child's age and physical and mental vulnerabilities;

- the frequency and nature of out-of-home placements;

- the magnitude, frequency, and circumstances of the harm to the child;

- whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency;

- whether the child is fearful of living or returning to the child's home;

- the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

- whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

- whether there is a history of substance abuse by the child's family or others who have access to the child's home;

- whether the perpetrator of the harm to the child is identified;

- the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

- the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

- whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with (1) minimally adequate health and nutritional care; (2) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (3) guidance and supervision consistent with the child's safety; (4) a safe physical home environment; (5) protection from repeated exposure to violence even though the violence may not be directed at the child; and (6) an understanding of the child's needs and capabilities; and

- whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b).

In addition, courts may consider other nonexclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding, including (1) the desires of the child, (2) the

present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody, (5) the programs available to assist those persons seeking custody in promoting the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive, and evidence is not required on all of the factors to support a finding terminating a parent's rights. *Id.*; *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

In considering the above factors, we note that D.S.O. was two years-old at the time of the termination hearing and had been removed at eleven months of age. She had thus been living with her foster parents for the majority of her life. There was evidence that D.S.O. had bonded with her foster parents and with Roxanne S. However, while D.S.O. "flourished" with her foster parents, there was evidence that Roxanne S. was unable to meet D.S.O.'s needs. When D.S.O. came into the Department's care, she was developmentally behind, had behavioral and communication problems, hearing problems, and was overweight. For over a year, the foster parents and Cuellar worked with D.S.O., resulting in D.S.O. meeting all developmental goals. There was evidence that Roxanne S. was reluctant and uninterested in continuing therapeutic services. There was also evidence that Roxanne S. repeatedly did not meet D.S.O.'s hygienic needs during monitored visits. Nor did Roxanne S. show stable employment or the ability to give D.S.O. a stable home environment. Although Roxanne S. admitted she needed much help to care for D.S.O., she was not able to show a stable support system. Instead, despite warnings from the Department's caseworker to disassociate herself from Jessica, Roxanne S. continued to bring Jessica to court hearings and monitored visits. Additionally, Roxanne S.'s Facebook page continued to post

advertisements about the unlicensed tattoo service she performed in her home. Her Facebook page contained pictures of people, including children, making gang symbols. While Roxanne S. claimed she was no longer affiliated with a gang, she still had tattoos of that gang's symbols. And, Roxanne S. had a long history of drug addiction and testified she only stopped using drugs when she discovered she was pregnant with D.S.O. She testified she had had two other children removed from her home by the Department due to her drug use. She also had a criminal history and was presently on probation. This evidence is legally sufficient to support the trial court's finding that termination of the parent-child relationship is in D.S.O.'s best interest.

During her testimony, Roxanne S. claimed that she did not know her Facebook login and that those postings were old postings. She testified she no longer ran the tattoo business out of her home and that she had not removed some of the gang tattoos on her body because it was too expensive. She also claimed that Jessica's cases had been "ruled out" and saw no danger in exposing Jessica to D.S.O. In a factual sufficiency review, we must defer to "the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 2014 WL 1998440, at *3. And, in reviewing the entire record, a rational factfinder could have not believed this testimony from Roxanne S. The trial court's best-interest finding is factually sufficient.

We therefore affirm the trial court's order of termination.

Karen Angelini, Justice